# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

KALEIGH LYNN FRYER,    )
            )
  Petitioner,     )
            )
vs.          )   Case No. CIV-14-662-D
            )
DEBBIE ALDRIDGE, Warden,  )
Mabel Basset Correctional Center, )
            )
  Respondent.[1]    )

## MEMORANDUM OPINION

Petitioner, a state court prisoner proceeding *pro se*, has filed a petition for writ of habeas corpus seeking relief pursuant to 28 U.S.C. § 2254. [Doc. 1]. Petitioner challenges the conviction entered against her in Logan County District Court Case No. CF-10-91. Tried by a jury in 2011, Petitioner was found guilty of first degree murder and sentenced to life imprisonment.

Petitioner presents seven grounds for relief. Respondent has responded to the petition. After a thorough review of the state court record (which Respondent has provided), the pleadings filed in this case, and the applicable law, the Court finds that, for the reasons set forth below, Petitioner is not entitled to the requested relief.

---

[1] *Pursuant to Fed. R. Civ. P. 25(d), Debbie Aldridge, who currently serves as warden of the Mabel Bassett Correctional Center, is hereby substituted as the proper party respondent in this case.*

# I. Procedural History.

Petitioner appealed her conviction to the Oklahoma Court of Criminal Appeals (hereinafter "OCCA"). In *Fryer v. State*, No. F-2011-919, slip op. (Okla. Crim. App. Aug. 21, 2013), the OCCA affirmed her conviction. Petitioner did not seek certiorari to the United States Supreme Court. She filed this action, challenging her state court conviction.

# II. Facts.

The following is a summary of the facts of Petitioner's case. More facts will be discussed throughout the opinion as needed.

At around 7:00 a.m. on May 13, 2010, Guthrie police officers were dispatched to 402 West Orbit, in Guthrie Oklahoma. Trial Tr. vol. III at 51-52. When they arrived, they encountered Petitioner standing in the carport/porch area of the home. *Id*. at 53. Police spoke briefly with Petitioner and entered the home. *Id*. at 53. They found the victim Lewis Keith Fryer Jr. lying dead at the foot of his bed, his body partially covered with a blanket. *Id*. 57-58, 156. Once they cleared the home, a police officer interviewed Petitioner, who said that she had been asleep all night, and found her father dead after she woke up around 7:00 a.m. *Id*. at 106-107; State's Ex. 12-A. Another officer used Petitioner's cell phone to speak to Petitioner's mother, who arrived to be care for Petitioner. Trial Tr. vol. III at 112. Agents from the Oklahoma State Bureau of Investigation ("OSBI") also arrived. They discovered that Petitioner was fifteen years old and lived with her father—the victim—Lewis Keith Fryer Jr. Petitioner's father and

mother were divorced, and she and her brother lived with her father following the divorce. May 16, 2011 Tr. at 65-66. Her brother, Lewis Keith Fryer III moved out at some point prior to the victim's murder. *Id*. at 72-73. Michael Dean, the OSBI agent in charge of the investigation, interviewed Petitioner and went to find Petitioner's brother. After interviewing Petitioner's brother and discovering that he had a confirmed alibi for the time of the murder, Dean went back to the home. Trial Tr. vol. VI at 19-20. Dean directed an officer to interview Kaleigh again at the police department and assigned another officer to seek a warrant for the cell phone, which was still in police custody. *Id*. at 20.

After agents received a search warrant for the home, they began their crime scene investigation. *Id*. The investigation revealed a violent scene, with signs of struggle in the victim's bedroom. *Id*. at 21. Agents checked the doors and windows of the home and found no signs of forced entry. *Id*. at 23. One window was slightly open, but agents did not find any evidence that anyone had entered the house through that window recently. *Id*. At that point, agents began to suspect Petitioner's involvement, as there had been no forced entry, the house was not ransacked, and only a few items were taken. *Id*. at 27. In canvassing the neighborhood, agents began discovering that Petitioner lied about certain things in earlier interviews. *Id*. at 27-31.

Friends in the neighborhood told agents that Petitioner had a boyfriend named Jerry Chiles, who stayed with another family in the neighborhood. *Id*. at 28. Agents also discovered that Petitioner may have been pregnant by Chiles. *Id*. at 29. Around 3:30

p.m. that day, Chiles' friend, Sarah Kester, told agents that Chiles had called her and said that he was at Crossroads Mall, and wanted someone to get him. *Id*. at 32-33. Chiles was taken into custody at around 4:00 p.m. *Id.* at 33.

Dean and another officer interviewed Chiles. Chiles initially denied any involvement, telling police that he left Guthrie at 12:30 a.m. with a girl named Rachel and her friends, but they had kicked him out of the car at Crossroads Mall. *Id*. at 35-36. After he was pressed on that story, Chiles admitted that he lied and said that he took the victim's car. *Id*. at 36. Agents questioned Chiles further, and he admitted to killing the victim. *Id*. At first, he told the agents that he went to Petitioner's home to see her, but the victim confronted him, leading to a struggle which ended in the victim's death. *Id*. at 36. Agents confronted Chiles with problems with his story, and Chiles eventually told police the same story that he told at trial. *Id*. at 38.

Chiles testified at trial about the events surrounding the murder. He and Petitioner had met at a carnival, after which Chiles went to a motel with Petitioner and her mother. Trial Tr. vol. VI at 136. They stayed at the motel all weekend, drinking alcohol and using marijuana. *Id*. at 136-37. Chiles was 21 years old at the time. *Id*. at 125. Chiles and Petitioner had dated for about four months at the time of the murder. *Id*. at 127. Chiles spent a significant amount of time at Petitioner's home, though not when her father was home. *Id.* at 129-130. A couple of weeks before the murder, Petitioner and Chiles were at a park called Silver Valley, and Petitioner asked Chiles to kill her father so that she could live with her mother. *Id*. at 139-41. She told Chiles she would leave the

back door of her home open for him, told him where to find a knife in the kitchen, and where he could locate the victim's keys and wallet. *Id*. at 143-44. Chiles agreed to kill the victim, claiming he had strong feelings for Petitioner. *Id*. at 141-42. Petitioner walked Chiles through the plan on May 12, 2010, showing him where to find the knives and her father's things. *Id*. at 150. She also told him that she was pregnant that day. *Id*. at 146. On the night of May 12, 2010, Petitioner again asked Chiles to kill the victim, requesting that he do it before the weekend. *Id*. at 145. Chiles agreed. *Id*.

At 3:00 a.m. on May 13, 2010, Chiles went to Petitioner's home. *Id*. at 154. He entered through the back door. *Id*. at 155. He stopped outside of the victim's bedroom, where he observed the victim sleeping. *Id*. at 156. Chiles then went to the kitchen and drew a knife from the knife block. *Id*. at 157. He walked back to the victim's room and stood, shaking and sweating. *Id*. He saw the victim's arm move, and he started swinging the knife. *Id*. at 158. The victim got up and started wrestling with Chiles, and even managed to get control of the knife. *Id*. Chiles wrested the knife from the victim, cut his hands, and stabbed him in the neck. *Id*. at 158-59. The victim fell to the floor beside the bed, his face looking towards the bed. *Id*. at 159. Chiles took the victim's phone, wallet, keys, and a cup full of change. *Id*. at 161, 165. He looked through a zippered black notebook, which Petitioner had told him sometimes contained money, but did not find anything. *Id*. at 154, 161-62. Chiles then left in the victim's car and drove toward Oklahoma City. *Id*. at 163. He stopped at a convenience store in Edmond, where he changed clothes, used the restroom, and purchased a cigar with money from the cup he

took. *Id*. 163-65.  He drove to Crossroads Mall and dropped off a bag of his belongings. *Id*. at 168.  He then drove to a nearby neighborhood and abandoned the car, locking the doors and placing the keys in the center console. *Id*. at 169-70.  Chiles went to a 7-Eleven near the mall and called Petitioner's cell phone at around 7:00 a.m. *Id*. at 170-71. He talked to Petitioner, who commented that there was a lot of blood. *Id*. at 171.  She told him that after they hung up, she would call the police. *Id*.  Chiles expected Petitioner and her mother to pick him up at Crossroad Mall, but they never came. *Id*. at 174,180.

Chiles stayed at the mall all day, calling Petitioner's cell phone five more times from a pay phone, and each time only reaching her voicemail. *Id*. at 175.  He also called Sarah Kester, who told him that the police were investigating. *Id*. at 175.  Chiles stayed at Crossroads Mall until he was picked up by a police officer. *Id*. at 181.

Having elicited this story from Chiles, agents set about to corroborate his statement.  Trial Tr. vol. VI at 40, 43-45.  They found the victim's vehicle, locked with the keys in the center console. *Id*. at 44.  They found bloodstains near the back door through which Chiles said he entered and exited. *Id*. at 72-73; Trial Tr. vol. III at 132. They found that, based on the post-mortem lividity in the victim's face, he had died facing the bed.  Trial Tr. vol. VI at 47-48.  Petitioner's cell phone records showed that Chiles had indeed talked to her at around 7:00 a.m., and that she called 911 shortly thereafter. *Id*. at 63-64.  The records confirmed that Chiles called her five additional times that day. *Id*. at 67.  The records also revealed that Petitioner accessed her voicemail at 3:30 a.m., thirty minutes after the murder, and accessed the internet through

her phone at 3:35 a.m. and 5:44 a.m. *Id*. at 63. Surveillance video showed that Chiles was at the convenience store in Edmond at 3:30 a.m. *Id*. at 68. Officers later took Petitioner into custody and charged her with the murder of her father. Trial Tr. vol. IV at 41-43.

### III. Standard of Review.

#### A. Exhaustion as a Preliminary Consideration.

The exhaustion doctrine is a matter of comity. It provides that before a federal court can grant habeas relief to a state prisoner, it must first determine that she has exhausted all of her state court remedies. As acknowledged in *Coleman v. Thompson*, 501 U.S. 722, 731 (1991), "in a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." While the exhaustion doctrine has long been a part of habeas jurisprudence, it is now codified in 28 U.S.C. § 2254(b). Pursuant to 28 U.S.C. § 2254(b)(2), "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."

#### B. Procedural Bar.

Beyond the issue of exhaustion, a federal habeas court must also examine the state court's resolution of the presented claim. "It is well established that federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" *Cone v. Bell*, 556 U.S. 449, 465 (2009) (quoting

*Coleman*, 501 U.S. at 729).  "The doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." *Coleman*, 501 U.S. at 729-30.

### C.     Merits.

When a petitioner presents a claim to this Court, the merits of which have been addressed in state court proceedings, 28 U.S.C. § 2254(d) governs the Court's power to grant relief.  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (acknowledging that the burden of proof lies with the petitioner).  Section 2254(d) provides as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The focus of Section 2254(d) is on the reasonableness of the state court's decision.  "The question under AEDPA [Antiterrorism and Effective Death Penalty Act of 1996] is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

"Under § 2254(d), a habeas court must determine what arguments or theories supported . . . the state court's decision; and then it must ask whether it is possible

fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). Relief is warranted only "*where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents.*" *Id*. (emphasis added). The deference embodied in "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* at 102-03 (citation omitted). When reviewing a claim under Section 2254(d), review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 181.

## IV. Analysis.

### A. Ground One: Sufficiency of Evidence.[2]

Petitioner challenges the sufficiency of the evidence in her case. She argues that the only evidence connecting her to the murder—besides Chiles' testimony—was (1) the manner of Chile's entry into the house, and (2) the fact that she was awake around the time of the murder. [Doc. 1-1 at 2-4]. She claims that this evidence is suspect and cannot support her conviction. *Id*. Petitioner also claims that other evidence about her demeanor and motives was unreliable. *Id*. at 4. The OCCA rejected the claims on direct appeal because the jury was properly instructed on the use of accomplice testimony and

---

[2] The grounds Petitioner presents were all presented in substantially the same manner to the OCCA on direct appeal. Petitioner appears to incorporate those grounds and arguments by reference. Considering Petitioner's *pro se* status, the Court has taken the arguments made to the OCCA into account, even if not explicitly raised within the petition.

independent evidence linked Petitioner to the crime.  *Fryer*, No. F-2011-919, slip op. at 2-3.  Petitioner challenges that conclusion.

### 1. *Clearly Established Law.*

To determine whether evidence is sufficient to support a criminal conviction, courts ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  On habeas review, this is a mixed question of law and fact, governed by 28 U.S.C § 2254(d)(1) and (d)(2).  *Maynard v. Boone*, 468 F.3d 665, 673 (10th Cir. 2006).  This Court must therefore presume that the OCCA's factual determinations are correct, unless the Petitioner rebuts that presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  On the legal question, this Court cannot overturn the OCCA's sufficiency determination unless that decision is objectively unreasonable.  *Parker v. Matthews*, 132 S. Ct. 2148, 2152 (2012).  The Supreme Court has described this standard as "twice-deferential."  *Id*.

### 2. *Analysis.*

The OCCA did not list the facts it considered when determining that the evidence was sufficient, but this Court cannot say that the OCCA's decision was objectively unreasonable.  Chiles' testimony revealed that Petitioner asked him to murder her father and arranged the plan for accomplishing that goal.  Trial Tr. vol. IV at 139-40,143-45.  She plotted to leave the door unlocked for him on the night of the murder, directed him to

the knife block where he found the murder weapon, and told him where he could find her father's money and car keys. *Id*. at 143-45. Despite her statement that she was asleep until hours after the murder, phone records show she was awake as soon as thirty minutes after the deed was done. Trial Tr. vol. V at 102. Evidence of lividity in the victim's face shows that, contrary to her statement to police, Petitioner moved the victim's body after he died. Trial Tr. vol. VI at 48-50. Evidence at the crime scene indicated that Chiles left the house through the back door, which was then locked and dead-bolted behind him. Trial Tr. vol. III at 132; Trial Tr. vol. VI at 72-73. Petitioner challenged many of these facts at trial and raised alternate theories and inferences based on the physical evidence. But viewing the evidence in the light most favorable to the prosecution, as required by *Jackson*, a reasonable juror could have found her guilty beyond a reasonable doubt. Therefore, the OCCA's decision was not objectively unreasonable.

Petitioner also advances the narrower argument that Chiles' testimony was not adequately corroborated as required by Oklahoma law. This argument carries no weight in habeas review. Under Section 2254, habeas relief is only warranted where a state court conviction "was contrary to or an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." The Supreme Court has never required accomplice testimony to be corroborated by independent evidence, and the Tenth Circuit has specifically rejected such a requirement. *See Cummings v. Sirmons*, 506 F.3d 1211, 1237 (10th Cir. 2007). Therefore, even if Chiles' testimony was not appropriately corroborated under Oklahoma law, Petitioner cannot

obtain habeas relief because the OCCA's decision was not contrary to or an unreasonable

application of clearly established federal law.  Ground One is denied.

## B.  Ground Two:  Illegal Seizure of Cell Phone.

Petitioner claims that the trial court should have suppressed evidence regarding

her cell phone and related phone records, as the cell phone was illegally seized.  The

police first took possession of Petitioner's cell phone at the scene of the crime.  They

professed that they had no suspicions of her involvement at that time, but wanted to speak

to her mother.  Trial Tr. vol. III at 69, 71.  The officer who spoke to her mother never

returned the cell phone, and instead passed it on to another officer.  *Id*. at 72-73.

Although Petitioner requested her cell phone later that morning, she never received it.  *Id*.

at 119.  The law enforcement officials eventually obtained a warrant to search the phone,

at which time they uncovered the evidence presented at trial.  *Id*. at 194-95.  Petitioner's

attorney did not file a motion to suppress the evidence, but did object to the evidence

based on the illegal seizure and an insufficient chain of custody for the cell phone.[3]

On appeal, Petitioner challenged the seizure of the cell phone, alleging that the

police illegally took possession of the cell phone and that the subsequent warrant did not

cure the illegal seizure.  Appellant's Br. at 11-15.  The OCCA denied relief, holding that

---

[3] The record is somewhat ambiguous on this point, but it appears that defense counsel objected at
trial to the cell phone's admission based on illegal seizure and improper chain of custody.  Trial
Tr. vol. III at 121.  The trial court sustained the objection based on the chain of custody issue.
*Id*.  When the prosecution later attempted to move for the admission of the cell phone after
testimony regarding chain of custody, defense counsel again objected based on chain of custody,
but not on the legality of the search.  Trial Tr. vol. V at 100.  The trial court overruled that
objection.

the cell phone evidence's discovery was inevitable. *Fryer*, No. F-2011-919, slip op. at 3-5. Petitioner now challenges the OCCA's decision.

Under *Stone v. Powell*, "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." 428 U.S. 465, 494 (1976). An "'[o]pportunity for full and fair litigation' includes, but is not limited to, the procedural opportunity to raise or otherwise present a Fourth Amendment claim." *Gamble v. Oklahoma*, 583 F.2d 1161, 1165 (10th Cir. 1978). It also "contemplates recognition and at least colorable application of the correct Fourth Amendment constitutional standards." *Id*.

Petitioner had a full and fair opportunity to litigate this issue in state court. While she did not formally file a motion to suppress, Petitioner did raise the issue at trial and on appeal. The OCCA gave careful consideration to her claim, appeared to recognize the correct legal standards, and properly identified *Nix v. Williams*, 467 U.S. 431 (1984), as the controlling authority for the inevitable discovery exception. It therefore appears that Petitioner had an opportunity to litigate this issue in state court, and the OCCA recognized the proper legal standards and conducted a colorable application of those standards. This Court therefore cannot address this claim in a habeas action.[4] Relief is denied as to Ground Two.

---

[4] Even if Petitioner did not receive a full and fair opportunity to litigate this issue, the record is clear that the cell phone and the relevant phone records would have been inevitably discovered in the course of the investigation. Therefore, the claim would fail on its merits.

**C. Ground Three:  Prosecutorial Misconduct.**

Petitioner claims that prosecutors violated her Fifth Amendment rights by (1) violating the trial court's ruling on a motion in limine; (2) presenting false or misleading evidence; (3) misrepresenting facts during closing argument; (4) suggesting false answers to witnesses; (5) and impugning defense counsel.  Petitioner raised these claims on direct appeal.  *Fryer*, F-2011-919, slip op. at 5-6.  The OCCA found the prosecutors' actions were proper, with the exception of their discussion of defense counsel.  *Id*.  Still, the OCCA found that impropriety did not affect Petitioner's substantial rights.  *Id*. at 6.

**1. *Clearly Established Law.***

Prosecutors can advocate with earnestness and vigor, and may strike hard blows.  *Berger v. United States*, 295 U.S. 78, 88 (1935).  But prosecutors may not strike foul blows.  *Id*.  The line between hard and foul is an uncertain one, and even the Supreme Court has admitted that "there is often a gray zone."  *United States v. Young*, 470 U.S. 1, 8 (1985).  To resolve prosecutorial misconduct claims, courts must first determine whether misconduct even occurred.

If prosecutorial misconduct occurs, it ordinarily warrants habeas relief only when the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Le v. Mullin*, 311 F.3d 1002, 1013 (10th Cir. 2002).  This analysis considers the trial as a whole, and factors in the strength of the evidence, cautionary steps to counteract improper remarks, and defense counsel's failure to object.  *Id*.  The determination of whether the misconduct rendered the trial fundamentally unfair

"essentially duplicate[s] the function of harmless-error review." *Cargle v. Mullin*, 317 F.3d 1196, 1207 (10th Cir. 2003). If the misconduct deprives a defendant of a specific constitutional right, however, proof that the entire proceeding was unfair may not be necessary. *Paxton v. Ward*, 199 F.3d 1197, 1218 (10th Cir. 1999).

**2.** *Analysis*.

The OCCA determined that the challenged actions were either proper or not prejudicial. Considering the specific examples of prosecutorial misconduct that Petitioner highlights, the Court finds that the OCCA's conclusion is not contrary to or an unreasonable application of clearly established law.

a. *Violations of the motion in limine.*

Prior to trial, Petitioner filed a motion in limine requesting that witnesses not discuss her demeanor at the time of her arrest and afterward. The trial court ruled that officers could testify as to their observations about her demeanor, but could not give their opinions regarding her demeanor. Trial Tr. vol. III at 24. Petitioner claims that prosecutors violated that order several times throughout the trial.

Of the examples that Petitioner presented to the OCCA, only one arguably shows impropriety on the prosecutor's part. The majority of examples show that the prosecutor asked general questions about law enforcement officers' concerns, or why they began to suspect Petitioner. While the officers may have volunteered information that drifted towards opinion testimony, the prosecutor's questions do not appear designed or intended to elicit such information. And the prosecutor's comments in closing argument were

related to Petitioner's demeanor and reasonable inferences drawn from her demeanor. The only close call was a prosecutor's inquiry as to an officer's "reaction" to the emotions displayed by Petitioner and her mother when they were alone. However, the OCCA's determination that the comments and questions were not improper is not itself contrary to or an unreasonable application of clearly established law. Therefore, habeas relief is not warranted on the issues related to the motion in limine.

      b. *Presentation of false and misleading evidence.*

Petitioner claims that a prosecutor purposefully elicited false or misleading information from an OSBI investigator. The investigator had interviewed Petitioner's brother, and wrote in his report that the brother thought that his mother might have wanted to hurt the victim. But at trial, the investigator testified that the brother identified both his mother and Petitioner as possibly having a desire to hurt the victim. Petitioner argues that the prosecutor knew the investigator would change his story and elicited the false information intentionally.

Knowingly failing to correct false testimony is improper. In fact, when the State, "although not soliciting false evidence, allows it to go uncorrected when it appears," a constitutional violation may occur. *Napue v. Illnois*, 360 U.S. 264, 269 (1959). While a stand-alone violation is possible under *Napue*, Petitioner limits her claim to prosecutorial misconduct, therefore it is under that standard that the Court addresses this claim.

The OCCA determined that the record did not support Petitioner's claim that the prosecution knowingly used false or misleading evidence. This issue presents a close

call.  The investigator's report shows that Petitioner's brother only thought his mother would want to harm his father, which is contrary to the investigator's testimony at trial. It is not certain whether Petitioner's brother did not mention her, or that he did mention her but the investigator omitted that information from the report.  Considering that ambiguity, and applying the appropriate deference under the AEDPA, the Court determines that the OCCA's decision was not unreasonable.

But even if the OCCA was incorrect and the prosecutor's failure to correct the record was improper, relief is still not warranted, as the failure did not render the entire proceeding fundamentally unfair.  The brother's opinion was immaterial in light of the entire trial.  Neither party cited the challenged evidence at any other time in the trial, nor did defense counsel object.  In light of the evidence of Petitioner's guilt, the prosecutor's failure to correct the investigator's testimony did not violate Petitioner's Fifth Amendment rights.

c.  *Misrepresentation of facts during closing.*

During closing arguments, the prosecutor mentioned that the largest knife in the knife block was missing.  The prosecutor also said that petitioner's phone records showed she used her phone at 3:00 a.m.  Petitioner argues that both statements misrepresented the evidence at trial and therefore constituted prosecutorial misconduct.

An OSBI agent discussed the knife block at trial.  Crime scene photos showed two empty slots in the block.  State's Exs. 47, 48.  It appears that there is one empty slot near the bottom right side of the block, while the other, larger slot is located near the top right

of the block. *Id*. The agent described the larger slot as one which normally houses a sharpening block. Trial Tr. vol. III at 179. The agent did not know whether that larger slot could have held kitchen shears or what type of knife was used in the murder. *Id*. at 179, 184. The OCCA found that, based on the record, counsel's reference to the "largest knife in that block" was a reasonable inference from the evidence.

Affording the OCCA the required deference, this Court cannot say that conclusion is objectively unreasonable. While it is likely that the large empty slot did not previously hold a knife, that possibility is not inconceivable. And if the slot had held a knife, that knife could very well have been the largest in the block. The facts at trial were vague regarding the actual murder weapon, therefore the Court cannot definitively say that the prosecutor's comment amounted to a misrepresentation. And even if the comment was improper, it was inconsequential. The size of the knife was irrelevant to the issues in the case, namely whether the Petitioner arranged her father's murder. A prosecutor even told the jury in closing that the size of the knife did not matter. Trial Tr. vol. VII at 73. The record shows that Petitioner told Chiles to get a knife from the block, but did not specify which knife. Chiles' independent selection of the knife does not have any relevance to Petitioner's actions. Therefore, any impropriety on that front did not render the trial fundamentally unfair.

Multiple witnesses discussed Petitioner's cell phone usage. The record shows unequivocally that Petitioner accessed her cell phone at 3:30 a.m. Chiles was murdering Petitioner's father at 3:00 a.m., but he was in Edmond at a convenience store at 3:30 a.m.

Therefore, the time at which Petitioner accessed her cell phone is relevant to whether Petitioner was awake during the murder. But during closing argument, a prosecutor mentioned that Petitioner was on her phone at 3:00 a.m., not 3:30 a.m. The OCCA found that the isolated misstatement did not affect Petitioner's substantial rights. That decision is not objectively unreasonable.

Prior to saying "she's on the phone at 3 o'clock," the prosecutor twice told the jury that Petitioner accessed her voicemail at 3:30 a.m. *Id*. at 22, 27-28. It is clear from the record that the misstatement was not an intentional attempt to mislead the jury. The jury heard through testimony and twice during closing arguments that Petitioner accessed her phone at 3:30 a.m. The Court cannot say that the isolated misstatement of time amounted to misconduct or undermined the fairness of Petitioner's trial.

d. *Misrepresentations to the trial court.*

Petitioner complains that prosecutors prevented her from presenting Chiles' recorded interview because the recording contained other information which the jury should not have heard, but then submitted their recording of Petitioner's interviews that also contained problematic information, and asked that the bailiff play that recording if the jury wanted to hear it during deliberations. Petitioner claims that prosecutors misled the trial court by claiming that their exhibit was properly tailored to exclude the improper information.

This issue relates to pre-trial motions in limine and a conflict question that arose before trial. Rather than labor through the detailed background, it is enough to point out

that prosecutors never told the trial court that their recording was properly tailored or redacted. Instead, they specifically asked the trial court *not* to allow its recording to go with the jury as they deliberated, because it contained problematic information. May 16, 2011 Tr. at 84-85. Prosecutors told the trial court that if the jury wanted to hear the portions of the recording that were played for the jury earlier in the trial (which were not problematic), the bailiff should control when the recording stopped to prevent the jury from hearing the improper information. *Id.* Thus, the prosecution was completely candid with the trial court as to the infirmities of its exhibit. While Petitioner may not appreciate that her exhibit was excluded, that dissatisfaction gives the Court no basis to find prosecutorial misconduct. The prosecutor's actions were not improper, and the OCCA's decision is therefore not contrary to or an unreasonable application of clearly established federal law.

> e. *Suggestion of false answers to witnesses.*

Petitioner claims that a prosecutor suggested false answers to an OSBI agent on redirect examination. She points specifically to the following exchange:

> Q. Agent Richardson, Counsel asked you, his question was, there was no evidence showing Kaleigh Fryer committed the murder in the crime scene.
>
> [. . .]
>
> Q. All right. And with regard to the crime scene, specifically State's Exhibit 100, which is the note, Baby don't forget to shut the window after your (sic) in okay. I love you and goodnight Boo, you're not saying that this isn't evidence that Kaleigh Fryer was involved in this murder?
>
> A. No ma'am, I'm not.

Q. All right. Because, in fact, it is evidence showing her involvement in this murder, isn't it?

A. Yes. It's a note, assuming it was written by her.

Q. Right. And also the diary which states, "Kaleigh, Kaleigh. My life sucks. I hate my dad. I wish I had a different life," once again, this is evidence that you collected from Kaleigh's house—

A. Yes it is.

Q. –Correct.

Trial Tr. vol. III at 185-86.

Although the prosecutor's questions were leading, nothing in the record shows that the prosecutor's questions supplied false information. The prosecutor asked those questions to clarify the agent's testimony after the defense attempted on cross-examination to show that the notes were irrelevant to the murder. *Id*. at 182-83. The prosecutor's questions did not explore how relevant the note was or whether it was indisputable evidence of Petitioner's involvement. The prosecutor only clarified that although the agent did not know definitively when the note was written or who wrote it, the note still had some relevance. The OCCA's conclusion that these questions did not amount to prosecutorial misconduct is not objectively unreasonable.

f. *Impugning defense counsel*.

Finally, Petitioner claims that the prosecution improperly referenced defense counsel during closing arguments by noting that defense counsel "has a job to do and his job is to see that Kaleigh Lynn Fryer walks out of these courtroom doors." Trial Tr. vol.

VII at 58.  The OCCA determined that these comments were improper, but found that they did not render the trial fundamentally unfair.  Having examined the entire record, the Court concludes that the OCCA's decision is not contrary to or an unreasonable application of clearly established law.  The comment, even if improper, was mild.  The evidence of Petitioner's guilt, while circumstantial, was strong.  The improper comment did not have a substantial effect on the fairness of the proceeding.

Because the instances of prosecutorial misconduct either did not rise to the level of misconduct, or did not render Petitioner's trial fundamentally unfair, relief is denied as to Ground Three.

**D. Ground Four:  Comment on the Right to Remain Silent.**

Petitioner claims that a prosecution witness made several comments on her right to remain silent, thereby violating her Fifth Amendment rights.  During direct examination, OSBI Agent Michael Dean discussed the investigation, including information received from the Petitioner.  Dean also discussed Chiles' confession and how it led them to seek out Petitioner for more questioning.  Dean testified that when they attempted to contact Petitioner, he "believe[d] either her attorney called us, or we did get in touch.  And she said, call my attorney.  One of those.  I don't recall.  But they went and retained an attorney."  Trial Tr. vol. VI at 45.  When the prosecutor asked what additional information Dean sought, he responded that he wanted more information about whether Petitioner moved the body and how she knew the wallet and mug of money were missing.  *Id*. at 50-51.  He also wanted her clothes for testing.  *Id*. at 51.  When the prosecutor

asked Dean whether he obtained any further interviews with Petitioner, he answered no. *Id*. On cross-examination, defense counsel asked Dean whether Petitioner came to counsel's office for the purpose of turning in her clothes for testing. *Id*. at 114-15. Dean responded that he did not think she went to counsel's office to surrender her clothes, but rather she had been in contact with counsel before the request for her clothing. *Id*. at 115.

On direct appeal, Petitioner claimed that these statements violated her Fifth Amendment rights by referencing her right to remain silent. The OCCA determined that only the investigator's comment that he did not obtain any more interviews with Petitioner could be construed as addressing her right to remain silent. *Fryer*, No. F-2011-919, slip op. at 7. The OCCA found that error harmless, however, and denied relief. *Id*.

### 1. *Clearly Established Law.*

"The state may not use a defendant's exercise of his right to remain silent to obtain his conviction." *Jones v. Stotts*, 59 F.3d 143, 146 (10th Cir. 1995) (citing *Wainwright v. Greenfield*, 474 U.S. 284, 292 (1986)). Allowing such comments "cuts down on the privilege [to remain silent] by making its assertion costly." *Griffin v. California*, 380 U.S. 609, 614 (1965). A comment is only improper if "'the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the defendant's right to remain silent.'" *United States v. Toro-Pelaez*, 107 F.3d 819, 826-27 (10th Cir. 1997) (quoting *United States v. May*, 52 F.3d 885, 890 (10th Cir. 1995)). If a trial court does allow improper comments on the

accused's right to remain silent, that error is subject to a harmless error analysis. *Battenfield v. Gibson*, 236 F.3d 1215, 1225 (10th Cir. 2001).

**2. *Analysis.***

The OCCA's determination that the majority of complained-of comments were not improper is reasonable. When Dean explained how he contacted Petitioner after interviewing Chiles, his comments were simply that he might have arranged the meeting through her attorney. This benign narrative was not manifestly intended to comment on Petitioner's silence, nor would the jury naturally and necessarily interpret the comment in that manner. The same is true for Dean's discussion of facts he wanted to clarify with the Petitioner. Dean went over various inconsistencies between Petitioner's statements and the physical evidence. Dean discussed these inconsistences in the context of explaining why he began to suspect that Petitioner played a role in the murder. Any reference to wanting to interview Petitioner was not intended nor could be construed as a comment on Petitioner's right to remain silent. And Dean's comment that Petitioner was in contact with defense counsel came in response to defense counsel's question as to her motivation to surrender her clothing. Defense counsel had questioned Dean at length about Petitioner's contact with counsel and whether she voluntarily came to counsel's office with the clothes. Petitioner cannot claim a Fifth Amendment violation when the comments were direct and accurate responses prompted by defense counsel's questions. In fact, defense counsel even commented that Dean's response "may be a more fair way

to put it." Trial Tr. vol. VI at 115. The Court cannot say that the OCCA was objectively unreasonable in deeming these comments proper.

The OCCA did find that Dean's comment that he had not obtained any further interviews with Petitioner could be construed as a comment on her exercise of her right to remain silent, but concluded that the error was harmless under *Chapman v. California*, 386 U.S. 18 (1967). Because the AEDPA is designed to limit habeas review rather than expand it, the Supreme Court has determined that when analyzing whether an error is harmless, federal courts should apply the more forgiving test set out in *Brecht* rather than the general unreasonableness test under AEDPA. *Fry v. Pliler*, 551 U.S. 112, 119 (2007). Therefore, when a state court finds an error harmless under *Chapman*, federal habeas courts must determine if the error "had substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 116 (quoting *Brecht*, 507 U.S. at 637 (1993)); *Littlejohn v. Trammell*, 704 F.3d 817, 833-34 (10th Cir. 2013). This standard is mandated by the "[i]nterests of comity and federalism, as well as the State's interest in the finality of convictions that have survived direct review within the state court system." *Littlejohn*, 704 F.3d at 834. To grant relief, the reviewing court must have grave doubts as to the error's effect on the verdict, and the court should "treat the error…as if it affected the verdict" if in "virtual equipoise as to the harmlessness of the error." *Selsor v. Workman*, 644 F.3d 984, 1027 (10th Cir. 2011) (quoting *Fry*, 551 U.S. at 121 n.3).

The Court has no grave doubts in this case. The prosecution presented significant evidence of Petitioner's motivations, schemes, and arrangements for her father's murder.

The majority of that evidence came from Chiles, whose testimony was amply supported by phone records and evidence at the crime scene. In contrast, the Petitioner had little evidence to support a viable defense, and her statements to police were shown to be false in multiple instances. The isolated comment that police were not able to get a further interview with Petitioner, even if improper, did not have a substantial and injurious effect on the jury's verdict. Relief is denied as to Ground Four.

**E. Ground Five: Improper Use of a Prior Consistent Statement.**

Petitioner claims that the trial court violated her due process rights by allowing the prosecution to introduce a letter that Chiles wrote to a friend, in which he gave the same account of the crime that he gave at trial. Petitioner argues that the letter was written after Chiles was charged and agreed to testify, and therefore was not properly introduced as a prior consistent statement under the Oklahoma Evidence Code. Petitioner raised this claim on direct appeal. The OCCA denied relief, finding that the letter gave the same account that Chiles related to the police before he was charged or before he agreed to testify. *Fryer*, No. F-2011-919, slip op. at 8. In those circumstances, the OCCA found that the consistent statement was not made "after the alleged fabrication, influence, or motive arose," therefore the trial court did not err in allowing the evidence.[5] *Id*.

Federal habeas courts cannot review state court actions that are based on state law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Federal review therefore focuses not on whether evidence was admissible under state law, but only on whether, "in light of the

_____

[5] It appears that the OCCA decided this claim solely on state law grounds, and did not squarely address the due process aspect. The Court therefore reviews this claim *de novo*.

entire record, its admission resulted in a fundamentally unfair trial." *Knighton v. Mullin*, 293 F.3d 1165, 1171 (10th Cir. 2002).

In light of the entire record, the letter's admission did not render Petitioner's trial fundamentally unfair. Testimony showed that the story Chiles told the police (before he was charged and before he agreed to testify) was the same as the story he told the jury. This consistency made the letter ancillary and of little evidentiary weight. Also, the physical evidence at the crime scene and phone records amply corroborated Chiles' story, further bolstering his testimony. The letter likely played little role in the jury's decision, and the Court cannot say that its introduction rendered the trial fundamentally unfair. Relief is denied as to Ground Five.

## F. Ground Six: Ineffective Assistance of Counsel.

Petitioner asserts several ineffectiveness claims based on her trial counsel's failure to (1) file a motion to suppress evidence from Petitioner's cell phone; (2) impeach witnesses; (3) utilize evidence to put a prosecution exhibit in context; (4) present an important exhibit in admissible form; and (5) preserve the record for appeal. Petitioner raised these claims on direct appeal, and the OCCA denied relief.

### 1. *Clearly Established Law*.

Counsel is constitutionally ineffective when counsel's deficient performance prejudices the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). On habeas review, courts must apply the *Strickland* and AEDPA standards to the facts of the case and decide whether "there is any reasonable argument that counsel

satisfied *Strickland's* deferential standard." *Harrington v. Richter*, 562 U.S. 86, 101, 105 (2011). Federal courts cannot disturb a state court's ruling unless the Petitioner demonstrates that the state court applied the highly deferential *Strickland* test in a way that every fairminded jurist would agree was incorrect. *Id*.

Courts analyze counsel's performance for "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. The Supreme Court shuns specific guidelines for measuring deficient performance, as "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Id*. at 688-89. Instead, courts must be highly deferential when reviewing counsel's performance, and the Petitioner must overcome the presumption that the "challenged action[s] 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). Even if Petitioner shows deficient performance, she must also show prejudice by establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.

## 2. *Analysis.*

The OCCA determined that Petitioner's counsel was not constitutionally ineffective.[6] That determination was not unreasonable.

### a. *Failure to file a motion to suppress.*

Petitioner asserts that trial counsel should have sought suppression of cell phone evidence based on alleged insufficiencies in the search warrant. Petitioner argues that the affidavit did not provide a sufficient basis for the magistrate to determine that the cell phone was relevant to the murder. Appellant's Br. at 41. The OCCA determined that because the affidavit provided a substantial basis for the magistrate's finding of probable cause for the search, and the contents of the cell phone would have been inevitably discovered, counsel was not ineffective. *Fryer*, No. F-2011-919, slip op. at 10.

The OCCA's decision is not unreasonable. First, while somewhat conclusory, the affidavit itself seems to provide probable cause to search the cell phone. The affidavit shows that Petitioner found the victim dead in his bedroom, covered with blood. O.R. Supp. Record at 392. The scenario can be readily identified as a death under suspicious circumstances. As such, electronic devices

---

[6] The OCCA cited *Strickland* in its analysis, and also frequently referred to a different ineffectiveness standard under OCCA Rule 3.11. As noted in *Lott v. Trammell*, 705 F.3d 1167, 1213 (10th Cir. 2013), a denial under Rule 3.11 "operates as an adjudication on the merits of a *Strickland* claim and is therefore entitled to deference under § 2254(d)(1)."

could be expected to contain evidence related to the crime, including information regarding possible suspects and motives. The affidavit could have been open to attack, but it was not so faulty that the OCCA was unreasonable in concluding that counsel's performance was not deficient for failing to challenge it. And even if counsel's performance were deficient, the OCCA's reliance on the inevitable discovery exception was reasonable.

The inevitable discovery exception allows the admission of evidence when the "prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444 (1984). In this case, the cell phone would have eventually been properly searched through lawful means. Even if the initial warrant were invalid, the investigators could have submitted new affidavits with more detail, thereby obtaining a valid warrant. Again, counsel could have challenged and litigated that issue, but the Court cannot say that counsel was objectively unreasonable in not doing so.

b. *Failure to impeach witnesses*.

Petitioner next claims that trial counsel should have impeached two witnesses with readily available extrinsic evidence. First, Petitioner claims that counsel should have confronted Agent Dean after he testified that Petitioner's

brother listed his mother and Petitioner as individuals that might want to hurt the victim, even though Dean's report showed that the brother only referenced his mother as a possible suspect. Appellant's Br. at 44-45. Second, Petitioner claims that counsel should have impeached Chiles' friend—who testified that she did not know him to be a violent person—with evidence that Chiles was the subject of a protective order for violent behavior. *Id*. at 45. The OCCA rejected both arguments on appeal, holding that these failures did not prejudice the defense. *Fryer*, No. F-2011-919, slip op. at 10-11.

The Court agrees that there is no reasonable probability that, but for these failures, the outcome of the trial would be different. Petitioner's brother testified at trial that his sister was "disloyal" to their father, that she did not like him, she was not good to him, and that she wanted to live with her mother. May 16, 2011 Tr. at 67-68. Regardless of whether counsel had impeached Dean's testimony, the jury still would have heard the brother testify about Petitioner's motivation for killing her father. The failure to impeach Chiles' friend is likewise inconsequential. The jury already knew that Chiles could be violent, since he admitted to stabbing the victim to death. Evidence that Chiles had been violent in a previous relationship would neither significantly undermine the prosecution's theory, nor create a reasonable probability that the jury would have found Petitioner not guilty.

Counsel was therefore not ineffective for neglecting those avenues of impeachment.

      c. *Failure to place the prosecution's exhibit in context.*

During trial, the prosecution introduced a page from a notebook recovered from Petitioner's home. The page read "Kaleigh Kaleigh. My life sucks. I hate my dad. I wish I had a different life." State's Ex. 102. Defense counsel had tried to exclude that evidence through an unsuccessful pre-trial motion in limine. Trial Tr. vol. III at 19-20, 23. The page directly across from the introduced page was dated June 28th. Because the murder occurred in May and the notebook was recovered on the day of the murder, Petitioner argues that the entry introduced at trial was likely written at least year prior to the murder. Petitioner claims that if defense counsel had presented the dated page, it would have diminished the prejudicial nature of the other page by showing Petitioner's statement that she hated her father was not fresh at the time of the murder. Appellant Br. at 46. Petitioner also asserts that the dated page gives context for her feelings, because it expressed her love for someone named "Billie" and lamented that her father forbid her from seeing Billie. *Id*. The OCCA determined that counsel's failure was not unreasonable, as that evidence could have likewise bolstered the prosecution's case by showing that Petitioner's hatred of her father was longstanding. *Fryer*, No. F-2011-919, slip op. at 11.

The Court does not find the OCCA's decision unreasonable. Courts must presume that counsel's decisions are part of a sound trial strategy, and counsel's omission of the

dated page can readily be construed as a strategic choice. The evidence at issue presents two dangers. First, as the OCCA pointed out, the dated page could be perceived as showing that Petitioner's hatred of her father was not of a fleeting nature, but was rather deep-seated and enduring. Second, the dated page indicates that Petitioner was angry with her father for interfering with a relationship. The jury could have inferred from that page that Petitioner had been angry with her father in the past for interfering with a relationship, and perhaps she anticipated her father would interfere with her relationship with Chiles. The consensus among the witnesses was that her father would not have approved of their relationship. It is reasonable to assume that the evidence could bolster the prosecution's case by adding another layer of motivation for the murder. The Court therefore cannot say that counsel was unreasonable for not presenting such evidence.

   d. *Failure to have key exhibit in admissible form*.

Defense counsel attempted to present a recording of Chiles' law enforcement interview to the jury. Trial Tr. vol. VI at 100-04. Because the recording contained information that was problematic, the trial court did not admit the evidence. *Id*. Petitioner now claims counsel should have prepared the exhibit in a way that would have made it admissible, contending that the recording would show that Chiles frequently denied planning the murder with her, that Chiles thought Petitioner accused him of the murder, and that Chiles believed that Petitioner would not go to prison because of her age. Appellant's Br. at 47-48. Petitioner also alleges that the recording shows Dean attributed some statements to Chiles that he did not make, and it would help negate the

prosecution's assertion that Petitioner was awake during the murder. *Id*. Petitioner raised this claim to the OCCA, which determined that counsel was not ineffective, as Chiles and Dean both testified about the interview, rendering the recording cumulative. *Fryer*, No. F-2011-919, slip op. at 11.

Counsel's failure did not prejudice the defense. Chiles and Dean both testified that Chiles lied during his interview and did not implicate Petitioner initially. And Chiles' reluctance to implicate Petitioner until he was told that she would not go to prison is a strong indication that he was trying to protect her, not that he was shifting the blame to save himself. As for the statements that may have weakened the prosecution's case, Petitioner neither identifies those statements nor expounds on their relevance to her defense. The recordings show several inconsistencies in Chiles' story prior to Chiles' final account. The recording therefore corresponds to testimony at trial. There is no reasonable probability that, had the jury heard the recorded interview, the outcome of the trial would be different.

e. *Failure to preserve the record*.

Petitioner's final ineffectiveness claim is based on trial counsel's failure to preserve the appellate record through appropriate objections. Specifically, Petitioner claims that counsel should have challenged the sufficiency of the search affidavit and tendered the recorded interview of Chiles after the trial court excluded it. Appellate Br. at 49. Also, Petitioner claims that counsel should have objected to comments about Petitioner retaining an attorney, Chiles' letter to his friend, incidents of prosecutorial

misconduct, and hearsay statements from various witnesses. *Id.* Petitioner raised this claim on direct appeal, and the OCCA determined that since it rejected the substantive claims upon which the ineffectiveness argument was based, the ineffectiveness claim based on a failure to preserve the record failed as well. *Fryer*, No. F-2011-919, slip op. at 11-12.

The Court has addressed the substantive issues underlying this claim. The Court found that suppression of the cell phone evidence was not warranted in Ground Two. *Supra* at p. 13. The Court determined above that Petitioner suffered no prejudice from counsel's failure to properly present Chiles' recorded interview. *Supra* at p. 34. The Court found that any comments regarding Petitioner's exercise of her right to remain silent were harmless. *Supra* at pp. 25-26. Chiles' letter did not render Petitioner's trial fundamentally unfair. *Supra* at pp. 26-27. Finally, the Court determined that the claims of prosecutorial misconduct were either unfounded or did not render Petitioner's trial unfair. *Supra* at p. 22. As the Court has determined that those issues do not warrant relief, Petitioner cannot show that counsel's failure to preserve the issues caused prejudice.[7]

On the hearsay issue, Petitioner argues that trial counsel was ineffective for not objecting to hearsay and preserving those issues for appeal. On appeal, Petitioner challenged hearsay statements related by Agent Dean. Dean spoke about the contents of

_____

[7] It is unclear whether Petitioner claims that this alleged ineffectiveness prejudiced her trial or her appeal, or both. The Court has therefore considered the prejudice to both her trial and her appeal in an abundance of caution.

Petitioner's cell phone records, which he received from her cellular provider. Trial Tr. vol. VI at 61-63. He also testified that he was told by the provider how to access the internet from the phone. *Id*. at 96-97. Dean conveyed Petitioner's brother's suspicions that Petitioner could have wanted to harm her father, and recounted Chiles' statements which were consistent with Chiles' trial testimony. *Id*. at 19, 46-50. Petitioner claimed on appeal that these statements were hearsay, and violated her Sixth Amendment right to confront witnesses against her.

The OCCA substantively rejected these hearsay claims, primarily because Petitioner was not prejudiced by the statements.[8] *Fryer*, No. F-2011-919, slip op. at 8-9. Because the OCCA found that Petitioner was not prejudiced by the introduction of those statements, it also denied her ineffectiveness claim based on counsel's failure to object to the statements. *Id*. at 12.

The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." The Supreme Court has interpreted that right as guaranteeing "a defendant's right to confront those "who 'bear testimony'" against him. *Crawford v. Washington*, 541 U.S. 36, 51 (2004). "A witness's testimony against a defendant is thus inadmissible unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 309 (2009). But not all statements are "testimonial." The

---

[8] The OCCA found that the cellular provider's statement to the investigator was not testimonial, but declined to decide whether the other statements were testimonial.

Supreme Court has "declined to precisely define the contours of what statements might be considered 'testimonial,'" though the Tenth Circuit has indicated that "[a] formal statement is testimonial if a reasonable person in the position of the declarant would objectively foresee that the primary purpose of the statement was for use in the investigation or prosecution of a crime." *United States v. Ibarra-Diaz*, 805 F.3d 908, 917 (10th Cir. 2015) (quoting *United States v. Smalls*, 605 F.3d 765, 778 (10th Cir. 2010)).

Of the statements that Petitioner highlights, only Dean's comments regarding how to access the internet and voicemail on the phone and his recitation of Chiles' and Petitioner's brother's statements were testimonial. Dean's reference to Petitioner's phone records did not involve testimonial statements. *See United States v. Yeley-Davis*, 632 F.3d 673, 679 (10th Cir. 2011) (cell phone records are not testimonial). Counsel was not ineffective for failing to preserve that meritless Confrontation Clause challenge.

Dean's recitation of Chiles' and Petitioner's brother's statements also did not violate the Confrontation Clause, because both were testifying witnesses. The Confrontation Clause protects the right to confront the declarants of the testimonial statements through cross-examination. Petitioner was able to cross-examine both declarants. Petitioner cites no authority, and the Court has located none, that apply the Confrontation Clause to statements by witnesses who actually testify at trial, even if those statements are presented by other witnesses. This may raise a hearsay issue, but not a

Confrontation Clause issue.[9]  Because any such Confrontation Clause challenge to those statements would be meritless, Petitioner cannot show that counsel's failure to object prejudiced her trial or appeal.

Finally, the Court doubts whether Dean's discussion of what steps Petitioner would have to take to access the internet and voicemail on her cell phone was testimonial hearsay.  Dean recounted how the cell phone worked, and it was not until cross-examination that it became clear that he received the information from the cellular provider.  Hearsay is defined as an out-of-court statement offered "to prove the truth of the matter asserted."  Fed. R. Evid. 801(c)(2).  Petitioner has not pointed to any out-of-court "statement" conveyed by Dean, only his understanding based on his investigation.  Still, even if the statement was testimonial hearsay, and even if counsel was unreasonable for not preserving that issue for appeal, the Court cannot say that it prejudiced the defense.  Had Dean not testified to the exact method of accessing internet and voicemail through the phone, the record still contained plenty of evidence to allow the jury to infer that it was Petitioner who accessed the phone.  The only alternate theory was that the phone accessed the internet and voicemail on its own, a most unlikely scenario.  The Court cannot say that Petitioner was prejudiced by counsel's failure to object to that evidence and preserve the issue on appeal.

---

[9] Petitioner raised the hearsay issue in the context of the Confrontation Clause claim, not as a separate claim.  A stand-alone hearsay claim would be an attack on a state evidentiary ruling, implicating the same analysis set out in Ground Five.  The court cannot say that the admission of these statements rendered Petitioner's trial fundamentally unfair, therefore any ineffectiveness claim based on a failure to object to hearsay would fail for lack of prejudice.

### *3. Conclusion.*

Petitioner fails to show that counsel rendered deficient performance which prejudiced her defense. Therefore, the OCCA's rejection of her ineffective assistance of counsel claims was reasonable. Relief is denied as to Ground Six.

## G. Ground Seven: Cumulative Error.

Petitioner claims that even if errors in her trial did not warrant relief individually, they do warrant relief when considered in the aggregate. Petitioner raised this claim on direct appeal and the OCCA denied relief, citing only one error in Dean's comment on her exercise of her right to remain silent. *Fryer*, No. F-2011-919, slip op. at 12.

The cumulative-error analysis addresses the possibility that two or more individually harmless errors might "prejudice a defendant to the same extent as a single reversible error." *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990). This analysis "aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *Id*. at 1470. Cumulative error only warrants reversal if the many errors "collectively 'had a substantial and injurious effect or influence in determining the jury's verdict.'" *Cargle v. Mullin*, 317 F.3d 1196, 1220 (10th Cir. 2003) (quoting *Brecht*, 507 U.S. at 638). Instances where courts find deficient performance by counsel must also be aggregated, even if the ineffectiveness claim was ultimately denied for insufficient prejudice. *Id*. at 1207.

The OCCA found error in Dean's comment about Petitioner's exercise of her right to remain silent. *Fryer*, No. F-2011-919, slip op. at 7. The OCCA also found that a prosecutor's comment about defense counsel was "improper." *Id*. at 6. The OCCA determined that the improper action did not affect Petitioner's substantial rights, but since that analysis duplicates the harmless error review, the Court will consider that improper conduct within the cumulative error analysis. The OCCA denied relief for Petitioner's claims that counsel should have impeached witnesses and should have presented the recording of Chiles' interview because Petitioner failed to show prejudice. *Id*. at 10-11. It is unclear whether the OCCA determined that counsel's failure to preserve the record did not constitute ineffectiveness based on reasonableness or the lack of prejudice, but the Court will assume the latter.

This leaves the Court with multiple errors to consider: comment on the right to remain silent, the prosecutor's comment about defense counsel, and defense counsel's failure to impeach two witnesses, present an exhibit in admissible form, and preserve errors for appeal. Having considered these errors and the record as a whole, the Court finds that the cumulative effect of these errors did not have a substantial and injurious effect or influence on the jury's verdict. The errors did not affect issues at the core of the case. The prosecution presented significant evidence establishing Petitioner's guilt, while the defense theory and evidence was weak. The errors, considered in the aggregate, were harmless. Relief is denied as to Ground Seven.

**VI.  Conclusion.**

After a thorough review of the entire state court record, the pleadings filed herein, and the applicable law, the Court finds that Petitioner is not entitled to the requested relief.  Accordingly, Petitioner's Petition (Doc. 1), is hereby **DENIED**.  A judgment will be entered accordingly.

IT IS SO ORDERED this 17th day of January, 2017.

_____
TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE